**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**CASE NO.:**_____

EILEEN AGURCIA, MARCO AGURCIA,
REGINA ANDERSON, HUGH ANDERSON,
ANTIQUARE INTERNATIONAL, LTD.,
ANITA BANDROWSKI, JERZY BANDROWSKI,
EDWARD BAUM, MARY BELVIN, MELINA
I. BJORNSTAD, PAMELA BOWEN, WILLIAM
BOWEN, MARY ANNE BOWIE, LINDA
BRENT, MARJORIE BURST, STILES BYRNE,
LAURA BYRNE, LOGAN BYRNE, GARRETT
BYRNE, VERONICA CALDERON, JUDITH
BURKE CANNON, KATHLEEN CONN,
DOROTHY DAVIS, PAUL DEMOS, CHERIE
DINOIA, DENNIS DINOIA, GAIL DINOIA,
STEVEN DINOIA, MARY DRUDY, ROBERT
DYNAN, PAT DZIERWINSKI, DIANE EMERY,
ESTATE OF JOHANNA GIWOSKY, ESTATE
OF JOHN P. NITCHIE, LINDA FRARY, RICHARD
FRARY, LISA MARIE GAUSLOW, GAIL
GILCHRIST, JANE BEST GRANDBOUCHE,
JESSIE GREER, AMY GREWAL, ANGELIA
HANDLON, JOEL HANDLON, THADDEUS
HANDLON, BARRETT HANDLON, GARY
HARTZLER, DENNIS HASSELL, HAYLEE
HINES, STEVEN T. HUNTINGTON, CHRISTINE
O. HUNTINGTON, PAULA KNUDSEN, L&R
INTERNATIONAL VENTURES, LUTHER LUCK,
BETTY F. LUPACCHINO, LYN MACBETH,
RICHARD MARTIN, JESSICA RHODES
MCFARLAND, ELIZABETH KNAUSS MURDOCH,
ANNA NARDELLA, JAMES NARDELLA, PATRICIA
NOVAK, NICCI NUNEZ, WALDRON PALMER,
BARBARA PARKER, LANCE PARKER, RENEE
PERUSSO, JAY PETTY, WALLY PHILLIPS,
RICHARD PORTER, CAMERON PRIESMEYER,
RACHEL RENNE, HARMONY CHRISTINA
ROBERTS, DOUGLAS ROBERTSON, WILLIAM
P. ROVIRA, IV, YVETTE S. ROVIRA, THERESA
SALPINO, JENNIFER SIDDONS, JOSEPH
SIMONETTA, JACK SIMS, LESLIE BYRNE
SOLT, RANDY SOLT, JOSHUA SOLT,

KATHARINE C. SRUR, PATRICIA ANN STAR, ALEX STEINWACHS, GARY STEINWACHS, LUCINDA STEINWACHS, MEGAN STEINWACHS, JEFFERY STERNS, ROBERT STRAYER, JR., LISA STRAYER, THE VISION CORPORATION, LTD., LYN TOWNSEND, VISION CORPORATION LIMITED (US), PATRICIA URBAN, WILLIAM VALENTI, YVETTE VALENTI, JAN VAN WART, CLIFFORD WRIGHT, AND ROSE WRIGHT,

Plaintiffs,

vs.

REPUBLICA DE HONDURAS, INSTITUTO DE LA PROPIEDAD, EMPRESA NACIONAL DE ENERGÍA ELÉCTRICA,

Defendants.

_____/

## **COMPLAINT**

Plaintiffs sue Defendants Republica de Honduras, Instituto de la Propiedad, and Empresa Nacional de Energía Eléctrica, (collectively, the "Honduras Government Defendants"), and allege as follows:

## **INTRODUCTION**

1.      This is an action by nearly one hundred U.S. citizens against the state of Honduras, its political subdivisions, and its agencies and instrumentalities, under the takings clause of the Foreign Sovereign Immunities act of 1976 ("FSIA"), 28 U.S.C. § 1605(a)(3), to redress the near-total devaluation of more than eighty acres of land and improvements thereon along with a valuable license issued by the World Trade Centers Associations.

2.      Through different vehicles, Plaintiffs invested in a mixed-use development located in San Pedro Sula, a city in northern Honduras.  Phase one of the project consisted of a residential development of approximately four hundred and twenty middle-income homes.  Phase two of the

development would consist of a commercial development offering office, retail, and meeting spaces spread out over eighty acres of land.

3.      The development also included the purchase of a license issued by the World Trade Centers Associations which would serve as a platform to increase the level of economic investment and development in San Pedro Sula and throughout Honduras, and would add value to the overall project, hereinafter referred to as "the Honduras Development Project."

4.      Beginning in 2012, a group acting as an umbrella organization for various purported social and political movements, known as the Confederación Nacional de Federaciones de Patronatos de Honduras (CONAFEPH), caused thousands of squatters to occupy large tracts of privately-owned lands surrounding the Honduras Development Project.

5.      With the knowledge and support of the Honduras Government Defendants, CONAFEPH and the squatters took over the surrounding land, filed frivolous petitions for its expropriation, and ignored several orders of ejectment issued by the Honduran courts. CONAFEPH's leaders have made it clear that expropriation of privately held lands is one of the group's most important objectives.

6.      As the squatters settled into the surrounding lands, they built homes, roads, and made other "improvements" to the land they were illegally occupying, and in the process created their own make-shift city.

7.      Along the way, the squatters received help from Honduras' national power company, Defendant Empresa Nacional de Energía Eléctrica. The company supplied the squatters with electricity despite the knowledge that they were illegally occupying private lands. Defendant Instituto de Propiedad also came to the squatters' aid by accepting their frivolous petitions for expropriation without conducting the necessary due diligence before admitting such filings and

later ignoring requests by the true land owners, including those associated with the Honduras Development Project, to intervene.

8.     The squatters surrounded the Honduras Development Project, and in so doing halted further construction, crippled home sales, and blocked the overall development of the Project's residential and commercial phases.

9.     An increase in violent crime directly linked to the squatters scared away potential home-buyers who were looking for the safe and secure housing that the Honduras Development Project sought to provide. The lack of safety and the general deterioration of the area all but eliminated any hope of attracting commercial tenants, meeting organizers, and others. But for the Honduras Government Defendants' support of the squatters, the Honduras Development Project would not have experienced these negative impacts.

10.     Before the squatters appeared, the Honduras Development Project was proceeding according to plan. Homes were built and sold. Improvements to the land continued. Monies were generated and paid out to the investors. Between 2007 and 2012, approximately $1 million was paid out per year in interest to those Plaintiffs holding debentures issued to finance the Honduras Development Project. When the squatters arrived, the money dried up. Home sales plummeted, additional construction stopped, and the Honduras Development Project could not be completed.

11.     The Honduras Government Defendants are directly at fault for the present situation. They have supported the squatters by allowing them to develop the occupied lands and file frivolous petitions for expropriation which effectively barred the private land owners from enforcing ejectment actions entered by the Honduran courts.

12.     With the knowledge and acquiescence of the Honduras Government Defendants, the squatters built homes and roads and received services like electricity critical to maintaining

their illegal settlement. The Honduras Government Defendants are well aware of the squatters' presence and the impact they have had on the Honduras Development Project. Nevertheless, Defendants have ignored requests by representatives of the Honduras Development Project to intervene thereby allowing the squatters to continue to illegally occupy private lands, block further development, and devalue the investment of the U.S. citizens in this action.

13.     Where, as here, a foreign state engages in both the unlawful taking of an asset belonging to U.S. citizens and in commercial activity with the U.S., the FSIA establishes jurisdiction in the federal courts.

## THE PARTIES

### The Plaintiffs

14.     The individually named Plaintiffs consist of hard-working Americans who, in several instances, invested most, if not all, of their retirement savings into the Honduras Development Project. Their goal was to do well by doing good. In each instance, the Plaintiffs identified below have been harmed as a result of the government-backed expropriation of the Honduras Development Project. The individually named Plaintiffs are:

15.     Eileen Agurcia, a 57-year-old U.S. citizen who currently resides in Tegucigalpa, Honduras.

16.     Marco Agurcia, a 55-year-old U.S. citizen who currently resides in Tegucigalpa, Honduras.

17.     Regina Anderson, a 68-year-old U.S. citizen who resides in Sarasota, Florida.

18.     Hugh Anderson, a 72-year-old U.S. citizen who resides in Sarasota, Florida.

19.     Antiquaire International, Ltd., a Anguilla for-profit corporation.

20.     Anita Bandrowski, a 45-year-old U.S. citizen who resides in San Diego, California.

21.     Jerzy Bandrowski lives, a 69-year-old U.S. citizen who resides in Tczew, Poland.

22.     Edward Baum, a 65-year-old U.S. citizen who resides in St. Augustine, Florida.

23.     Mary Belvin, a 66-year-old U.S. citizen who resides in Sarasota, Florida.

24.     Melina I. Bjornstad, a 22-year-old U.S. citizen who resides in Bradenton, Florida.

25.     Pamela Bowen, a 67-year-old U.S. citizen who resides in Snohomish, Washington.

26.     William L. Bowen, a 71-year-old U.S. citizen who resides in Burlington, Washington.

27.     Mary Anne Bowie, a 69-year-old U.S. citizen who resides in Sarasota, Florida.

28.     Linda Brent, a 69-year-old U.S. citizen who resides in Sarasota, Florida.

29.     Marjorie Burst, a 84-year-old U.S. citizen who resides in Charleston, South Carolina.

30.     Stiles Byrne, a 50-year-old U.S. citizen who currently resides in Tampa, Florida.

31.     Laura Byrne, a 46-year-old U.S. citizen who currently resides in Tampa, Florida.

32.     Logan Byrne, a 19-year-old U.S. citizen who currently resides in Tampa, Florida.

33.     Garrett Byrne, a 18-year-old U.S. citizen who currently resides in Tampa, Florida.

34.     Veronica Calderon, a 65-year-old U.S. citizen who resides in Dearfield Beach, Florida.

35.     Judith Burke Cannon, a 68-year-old U.S. citizen who resides in Sarasota, Florida.

36.     Kathleen Conn, a 80-year-old U.S. citizen who resides in Warwick, New York.

37.     Dorothy Davis, a 66-year-ld U.S. citizen who resides in Cottonwood, Arizona.

38.     Paul Demos, a 64-year-old U.S. Citizen who resides in Newtown, Pennsylvania.

39.     Cherie DiNoia, a 45-year-old U.S. citizen who resides in Sarasota, Florida.

40.     Dennis DiNoia, a 55-year-old U.S. citizen who resides in Sarasota, Florida.

41.     Gail DiNoia, a 77-year-old U.S. citizen who resides in Sarasota, Florida.

42.     Steven DiNoia, a 53-year-old U.S. citizen who resides in Eagle, Idaho.

43.     Mary Drudy, a 66-year-old U.S. citizen who resides in Lake Suzy, Florida.

44.     Robert Dynan, a 47-year-old U.S. citizen who resides in Sarasota, Florida.

45.     Pat Dzierwinski, as Executor for The Estate of Marlene Bunce, deceased on June 22, 2009.

46.     Diane Emery is a 61-year-old U.S. citizen who resides in St. Petersburg, Florida.

47.     Marie Bmcguirk as Trustee of the Johanna Giwosky Revocable Living Trust.

48.     Edie Skerl, as Personal Representative of The Estate of John P. Nitchie, deceased on August 14, 2007 in Monmouth County, New Jersey.

49.     Linda J. Frary, a 71-year-old U.S. citizen who resides in Sarasota, Florida.

50.     Richard H. Frary, a 77-year-old U.S. citizen who resides in Sarasota, Florida.

51.     Lisa Marie Gauslow, a 49-year-old U.S. citizen who resides in Philadelphia, Pennsylvania.

52.     Gail Gilchrist, a 58-year-old U.S. citizen who resides in Gulfport, Florida.

53.     Jane Best Grandbouche, a 64-year-old U.S. citizen who resides in Sarasota, Florida.

54.     Jessie Greer, a 77-year-old U.S. citizen who resides in Clearwater, Florida.

55.     Amy Grewal, a 49-year-old U.S. citizen who resides in Sarasota, Florida.

56.     Angelia Handlon, a 56-year-old U.S. citizen who resides in Wesley Chapel, Florida.

57.     Joel Handlon, a 48-year-old U.S. citizen who resides in Wesley Chapel, Florida.

58.     Thaddeus Handlon, a 27-year-old U.S. citizen who currently resides in Wesley Chapel, Florida.

59.     Barrett Handlon, a 24-year-old U.S. citizen who currently resides in Wesley Chapel, Florida.

60.     Gary Hartzler, a 71-year-old U.S. citizen who resides in Bradenton, Florida.

61.     Dennis Hassell, a 73-year-old U.S. citizen who resides in Bradenton, Florida.

62.     Haylee Hines, a 18-year-old U.S. citizen who currently resides in Wesley Chapel, Florida.

63.     Steven T. Huntington, a 66-year-old U.S. citizen who resides in Bradenton, Florida.

64.     Christine O. Huntington, a retired 69-year-old U.S. citizen who resides in Bradenton, Florida.

65.     Paula Knudsen, a 65-year-old U.S. citizen who resides in Sarasota, Florida.

66.     L&R International Ventures, a Florida Limited Liability Company whose sole manager is Plaintiff Richard Frary.

67.     Luther Luck, a 85-year-old U.S. citizen who resides in Sebring, Florida.

68.     Betty F. Lupacchino, a 72-year-old U.S. citizen who resides in Longboat Key, Florida.

69.     Lyn Macbeth, a 82-year-old U.S. citizen who resides in Philadelphia, Pennsylvania.

70.     Richard Martin, a 67-year-old U.S. citizen who resides in Sarasota, Florida.

71.     Jessica Rhodes McFarland, a 34-year-old U.S. citizen who resides in New York, New York.

72.     Elizabeth Knauss Murdoch, a 72-year-old U.S. citizen who resides in Daytona Beach, Florida.

73.     Anna Nardella, a 73-year-old U.S. citizen who resides in Sarasota, Florida.

74.     James Nardella, a 73-year-old U.S. citizen who resides in Sarasota, Florida.

75. Patricia Novak, a 84-year-old U.S. citizen who resides in Sarasota, Florida.

76. Nicci Nunez, a 27-year-old U.S. citizen who currently resides in Chicago, Illinois.

77. Waldron Palmer, a retired 66-year-old U.S. citizen who resides in Sarasota, Florida.

78. Barbara Parker, a 69-year-old U.S. citizen who resides in Bradenton, Florida.

79. Lance Parker, a 42-year-old U.S. citizen who resides in San Diego, California.

80. Renee Perusso, a 50-year-old U.S. citizen who resides in Sarasota, Florida.

81. Jay Petty, a 49-year-old U.S. citizen who resides in Sarasota, Florida.

82. Wally Phillips, a 64-year-old U.S. citizen who resides in San Rafael, California.

83. Richard Porter, a 57-year-old U.S. citizen who resides in Decatur, Georgia.

84. Cameron Priesmeyer, a 59-year-old U.S. citizen who resides in Smyrna, Georgia.

85. Rachel Renne, a 32-year-old U.S. citizen who resides in Nocatee, Florida.

86. Harmony Christina Roberts, a 36-year-old U.S. citizen who resides in Boulder, Colorado.

87. Douglas Robertson, a 68-year-old U.S. citizen who resides in Sarasota, Florida.

88. William P. Rovira, IV, a 36-year-old U.S. citizen who resides in Wesley Chapel, Florida.

89. Yvette S. Rovira, a 34-year-old U.S. citizen who resides in New York, New York.

90. Theresa Salpino, a 63-year-old U.S. citizen who resides in Gallitzin, Pennsylvania.

91. Leslie Byrne Solt, a 54-year-old U.S. citizen who currently resides in Wesley Chapel, Florida.

92. Randy Solt, a 45-year-old U.S. citizen who currently resides in Wesly Chapel, Florida.

93.     Joshua Solt, a 18-year-old U.S. citizen who currently resides in Wesley Chapel, Florida.

94.     Jennifer Siddons, a 40-year-old U.S. citizen who resides in Sarasota, Florida.

95.     Joseph Simonetta, a 74-year-old U.S. citizen who resides in Sarasota, Florida.

96.     Stephen Sims, a 52-year-old U.S. citizen who currently resides in Wheaton, Illinois.

97.     Greg K. Sims, a 55-year-old U.S. citizen who currently resides in Littleton, Colorado.

98.     Katharine S. Srur, a 68-year-old U.S. citizen who resides in Bay Harbor Islands, Florida.

99.     Patricia Ann Star, a 68-year-old U.S. citizen who resides in Sarasota, Florida.

100.    Alex Steinwachs, a 31-year-old U.S. citizen who resides in Pembroke Pines, Florida.

101.    Gary Steinwachs, a 58-year-old U.S. citizen who currently resides in Nokomis, Florida.

102.    Lucinda Steinwachs, a 56-year-old U.S. citizen who resides in Nokomis, Florida.

103.    Megan Steinwachs, a 26-year-old U.S. citizen who currently resides in Sarasota, Florida.

104.    Jeffery Sterns, a 52-year-old U.S. citizen who resides in Palm Harbor, Florida.

105.    Robert Strayer, Jr., a 60-year-old U.S. citizen who resides in Venice, Florida.

106.    Lisa Strayer, a 56-year-old U.S. Citizen who resides in Venice, Florida.

107.    The Vision Corporation, Ltd., a St. Vincent and the Grenadines Corporation.

108.    Lyn Townsend, a 51-year-old U.S. citizen who resides in Austin, Texas.

109.    Patricia Urban, a 66-year-old U.S. citizen who resides in Blackwood, New

Jersey.

110.    Vision Corporation, Limited, an inactive Florida Corporation.

111.    William Valenti, a 58-year-old U.S. citizen who currently resides in Panama City Beach, Florida.

112.    Yvette Valenti, a 57-year-old U.S. citizen who currently resides in Panama City Beach, Florida.

113.    Jan Van Wart, a 63-year-old U.S. citizen who resides in Sarasota, Florida.

114.    Rose Wright, a 71-year-old U.S. citizen who resides in Sarasota, Florida.

115.    Clifford Wright, a 75-year-old U.S. citizen who resides in Sarasota, Florida.

*The Defendants*

116.    Defendant Republica de Honduras is a "foreign state" within the meaning of 28 U.S.C. § 1603.

117.    Defendant Instituto de la Propiedad is a political subdivision of the Honduran Government as defined by 28 U.S.C. § 1603(a) and is charged with enforcing Honduras' property laws.  As relevant here, the Direccion General de Regulacion Predial ("DGRP") is housed within this political subdivision. The DGRP is charged with, among other things, resolving conflicts regarding right and title to and possession of real property.

118.    Defendant Empresa Nacional de Energia Electrica is an agency or instrumentality of Honduras as that term is defined in 28 U.S.C. § 1603 and is Honduras' national power company.

## JURISDICTION AND VENUE

119.    This Court has subject matter jurisdiction and personal jurisdiction over the Honduran Government Defendants pursuant to 28 U.S.C. § 1330 and the FSIA, 28 U.S.C. §§ 1602,

*et seq.,* for violations of customary international law as alleged herein, including the taking of the lands comprising the Honduras Development Project without just compensation.

120.     This Court has subject matter jurisdiction over the Honduran Government Defendants under 28 U.S.C. §§ 1603(a) and (b), and 1605(a)(3) because the Honduran Government Defendants fall within the FSIA's definition of a foreign state, a political subdivision, or agency or instrumentality thereof and are not immune from suit:

> . . . in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States.

121.     This Court also possesses supplemental jurisdiction over the Honduran Government Defendants for the additional claims pursuant to 28 U.S.C. § 1367(a).

122.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (f).

## GENERAL ALLEGATIONS

### A. The Development Project

123.     The Honduras Development Project was conceived as a mixed-use development project.  The project was located in San Pedro Sula, a city located in the northwestern corner of Honduras and considered the country's industrial capital.

124.     If successful, the Honduras Development Project would have created jobs, safe housing, and a significant platform for future economic development, all while providing a healthy financial return for investors.  The Project's capstone would have been a new World Trade Center ("WTC") licensed by the World Trade Centers Associations and designed to stimulate trade and investment opportunities in San Pedro Sula and throughout Honduras.

125.     To further the goals of the Honduras Development Project, two companies were created:  DSA International Corporation ("DSA"), which is today an inactive Florida corporation, and Vision Communities ("Vision"), a Honduran company. Together, DSA and Vision would serve as the Honduras Development Project's developers.

**B.  The Investors**

126.     The Honduras Development Project initially raised $500,000 to offset costs associated with site selection, land acquisition, as well as the preparation of development and business plans.

127.     The project later raised an additional 500K from a small group of investors.

128.     Over the next three years, the Honduras Development Project purchased land, conducted engineering and environmental studies, prepared architectural renderings, and made improvements to the land.  Eventually, DSA and Vision employed some thirty employees and maintained offices in the United States and Honduras.

129.     By 2005, the Project required an additional infusion of capital. Plaintiff Cherie DiNoia, a financial planner with Shelby Financial Group, introduced her clients to the Honduras Development Project and invested in the project herself.

130.     Two funds were created in St. Vincent & the Grenadines to receive investment monies.  The first, *Paseo Las Fuentes Fund*, would receive investments earmarked for the residential side of the development, known as *Paseo Las Fuentes.*  The residential phase would consist of approximately four hundred and twenty homes spread out over eighty acres of land. This round raised approximately $2 million of the $150 million needed to complete the residential and commercial phases of the project. The balance of funds was secured through loans collateralized by the land itself.  A second fund, known as the *Plaza Mayor Fund*, was created to

collect funds for the commercial development phase of the project known as *Plaza Mayor*. In addition, the Honduras Development Project separately acquired the WTC license.

131. Another round of fundraising took place in 2007. Plaintiff Cherie DiNoia again introduced the Honduras Development Project to additional clients. Those who chose to invest in this round received debentures that offered a 10% to 12% quarterly return. From 2007 to 2012, the Honduras Development Project continued on schedule. The residential phase was under development with individual homes being sold and interest payments on the debentures being paid. During this five-year period, those individuals holding debentures collectively received approximately $1 million per year.

132. During this same period, some of the initial investors who purchased stock decided to liquidate their investments for various reasons, including retirement. An appraisal of the land and its improvements to-date in 2012, revealed that the stock value had doubled from $1 to $2 per share. Following the appraisal, those investors wishing to convert their stock to debt did so at the discounted rate of $1.80 per share. Those investors were issued debentures and began collecting interest payments.

## C. The Flow of Investor Funds

133. The capital for the Honduras Development Project initially came from individuals purchasing stock. The earliest investors transferred their investment funds from their U.S. financial institutions to a bank in St. Vincent & the Grenadines. The St. Vincent & the Grenadines bank would then transfer the funds to a Honduras-based bank account titled to Vision Communities, a company in Honduras.

134.     Beginning in 2004, investors would transfer their investment capital from their U.S. financial institutions to People's Community Bank and then to a Bank of America account titled in the name of Vision Corporation Limited, a Florida corporation.

135.     For those investors owning debentures, the monies used to pay their interest payment would flow from Vision Communities in Honduras to an account at Bank of America belonging to Vision, a U.S.-based entity designed to handle the payment of interest on the debenture notes.

**D.  Government-Backed Squatters Surround the Land and Paralyze the Development**

136.     Beginning on or about March 11, 2012, a group of government-backed squatters led by CONAFEPH overran the lands surrounding the Development Project.  CONAFEPH is the umbrella organization for various populist movements that advocate that private property be expropriated and title transferred to low income individuals throughout Honduras, including in San Pedro Sula, the site of the Honduras Development Project.  Figure 1 below shows the extent to which the squatters have surrounded the Honduras Development Project.



*Figure 1. Aerial Photograph of the area surrounding the Honduras Development Project.*

137.    The area in the upper left-hand side of the photograph circled in red represents a portion of the lands forming the Honduras Development Project.  The areas depicted outside of the red circle are private lands that have been overrun by government-backed squatters.

138.    As is visible from the photograph above, the squatters have built hundreds of makeshift structures on the land which is now populated by thousands of individuals. The aerial photograph depicts a level of planning, including roads permitting access into and out of the illegal settlement which could not have escaped the notice of the Honduran Government Defendants and, in fact, depended on their support.  Indeed, the squatters have received vital assistance from the government of Honduras, including Defendants Empresa Nacional de Energia Electrica and Instituto de Propiedad.

139.    This represented a significant turn of events, considering that just one year earlier, in 2011, the Honduran government hosted a highly publicized conference under the banner of

*Honduras is Open for Business*.  The gathering took place in San Pedro Sula in May of 2011 with the aim of attracting domestic and foreign investment to Honduras.  Representatives of the Honduras Development Project attended the conference and met with government officials to discuss the planned development. Honduras' then leader, President Porfirio Lobo Sosa, described the conference as a "fundamental milestone of the *National Program for Investment Promotion* which we consider is one of the most important instruments to meet the objectives of our Nation Plan."[1]  As part of this plan, Honduras' Congress approved the *Law for the Promotion and Protection of Investment* that would, among other things, provide equal treatment to the assets of both Honduran nationals and foreign investors like Plaintiffs here.[2]  Ironically, the law would also include a ban against the expropriation of land.[3]

140.    As the squatters settled into the surrounding lands, security guards were posted along the perimeter of the Honduras Development Project.  The guards reported receiving threats to their lives from the squatters.  On one occasion, the squatters occupied a main highway blocking access into or out of the Honduras Development Project for several days.  The residents living within the completed residential units of the Honduras Development Project were forced to arms themselves.

141.    As a result of the squatters' occupation of the land surrounding the Honduras Development Project, home sales plummeted, and the project came to a standstill.  Potential home buyers were scared away by the increase in crime and violence that followed the squatters' arrival. As sales decreased and eventually stopped, the developers attempted to keep the project afloat but ultimately could not sustain the costs. Of the four hundred and twenty houses planned as part of the residential development, only approximately one hundred were sold.  Eventually, forty-two

---

[1]    http://www.coha.org/honduras-is-open-for-business/ (last visited Nov. 20, 2017).

[2]    *Id.*

[3]    *Id.*

lots were forfeited for non-payment. The Honduras Development Project came to a halt. As for the commercial phase of the project, the development did not proceed beyond certain initial improvements, including the paving of a 120-foot main entrance, the installation of water and sewer connections and underground electrical and drainage systems, and the construction of a 15-foot water feature and roundabout.

**E.  The Squatters Petition for Expropriation with the Honduran Government's Support**

142.    Meanwhile, to legitimize their "claim" over the occupied lands, the squatters petitioned the Oficina Regional de Regularización Predial de la Cuidad de San Pedro Sula ("ORRP"), which operates under the auspices of Defendant Instituto de Propiedad, to formally expropriate the land on the grounds of public need. The ORRP accepted the squatters' petition without conducting any background investigation or verification of the underlying claim for expropriation. The ORRP's decision granted the squatters special status which then allowed them to oppose the land owners' attempts to eject them from the property in both May and October of 2012. This action by the Honduras Government Defendants effectively blocked the Honduras Development Project from being able to assert its legal rights as owners of the private lands.

143.    Although benefitting from Defendant Instituto de Propiedad's initial support, a Honduran court eventually denied the squatters' petition for expropriation on the basis of public need.

144.    Undeterred, the squatters refiled their petition before the ORRP. Despite the prior court ruling, the ORRP once again accepted the petition despite its failure to conform with local law. And, once again, the squatters were able to occupy the private lands until their petition was resolved. During this time, the squatters were able to halt any further construction or improvement of the Development Project.

145.     Hoping to avoid any further efforts by the squatters to block or delay construction, on or about September 2, 2013, a representative of the Honduras Development Project petitioned the ORRP's Director to intervene and prevent the filing of any further frivolous expropriation actions.  The Director did not respond.  After lengthy proceedings, a Honduran court again denied the squatters' petition.  Despite these court victories, the squatters remain on the land.

146.     On or about December 1, 2014, the Honduran newspaper *Diario La Prensa* carried a story in which a representative of Defendant Instituto de la Propiedad claimed that the government would give the squatters title to the lands they were occupying.

147.     As part of the coordinated effort between the Honduran Government Defendants and the squatters, Plaintiffs believe that key documents regarding their ownership of the lands at issue have been removed from official land records, or otherwise altered.  In particular, Plaintiffs believe that certain documents have been altered so that the actual location of the real property at issue is incorrect.  Plaintiffs contend that these alterations are designed to confuse local authorities and further prolong any future legal or administrative proceedings in Honduras.

148.     As further evidence of the Honduran Government Defendants' efforts to support the squatters at Plaintiffs' expense, an official speaking on behalf of Defendant Instituto de la Propiedad has stated that the Honduras Development Project failed to submit proper development plans.  This statement is patently false given that this agency had previously signed, sealed, and returned the plans to representatives of the Honduras Development Project.

149.     In or about early 2015, the Municipalidad de San Pedro Sula (effectively, the local government) announced its intention to rezone the lands occupied by the Development Project for low-income housing.

### F.  The Honduran Government Acknowledges the Taking

150.    On or about April 12, 2018, the Government of Honduras, through its representative, Luis F. Mata, in his official capacity as Secretary of State for the Promotion of Investments, met with the Plaintiffs' representatives in San Pedro Sula, Honduras.

151.    During that meeting, Secretary Mata acknowledged that the squatters had taken the lands at issue.  He further pledged the support of Defendant Republic of Honduras to rectify the situation.  Indeed, Secretary Mata voiced several potential resolutions which (albeit insufficient) confirmed Defendant Republic of Honduras' recognition that it had worked an expropriation by allowing the squatters to actively work to expropriate the lands at issue and to block development of and devalue the Honduras Development Project.

152.    At the close of the April 12, 2018 meeting, Secretary Mata invited the Plaintiffs' representatives to contact him in order to schedule a meeting with key representatives within the Honduran government who would be in a position to further address and rectify the expropriation.

153.    Despite his representations, neither Secretary Mata, nor any other representative of the Honduran Government, has replied to any of the Plaintiffs' subsequent attempts to schedule a meeting or resolve this matter.

## COUNT I:
## Taking in Violation of International Law

154.    Plaintiffs re-allege paragraphs 1-153 as if fully set forth herein.

155.    Defendant Honduras is a foreign sovereign and a "foreign state" within the meaning of the FSIA.

156.    Defendant Instituto de la Propieda is a political subdivision of Honduras and is therefore a "foreign state" within the meaning of the FSIA.

157.    Defendant Empresa Nacional de Energía Eléctrica is an agency or instrumentality of Honduras and is therefore a "foreign state" within the meaning of the FSIA.

158.     The Honduran Government Defendants engage in extensive commercial activities within the United States.

159.     Plaintiffs are U.S. citizens who invested in the Honduras Development Project with the understanding that their dollars would be used to acquire, develop, and improve certain real property located in San Pedro Sula Honduras for both residential and commercial use.

160.     Prior to the expropriation, Plaintiffs had a valuable interest in the Honduras Development Project, including the lands and improvements thereto.

161.     The Honduran Government Defendants have allowed thousands of squatters to take over the privately-owned lands surrounding the Honduras Development Project.  Defendants have provided the squatters material support in their continued occupation of those lands, including, but not limited to, the building out of infrastructure and the provision of various services.  In addition, Defendants have supported the squatters' illegal attempts to claim title to the land and have effectively blocked court orders requiring the removal of the squatters.

162.     Pursuant to the official acts of the Honduran Government Defendants, development of the Honduras Development Project has stopped and its assets significantly, if not entirely, devalued.

163.     Defendants' acts of expropriation are in violation of international law.

164.     The Honduran Government Defendants' actions are discriminatory and are based on Plaintiffs' status as U.S. citizens and/or their connections to the United States.

165.     Defendants' act of expropriation was taken without prompt, adequate, and effective compensation.  The expropriation at issue occurred in 2012 and the Honduran Government Defendants have, to date, failed to provide prompt, adequate, and effective compensation, as required by international law.

WHEREFORE, Plaintiffs demand judgment against Defendants Republica de Honduras, Instituto de la Propiedad, and Empresa Nacional de Energía Eléctrica, for compensatory damages suffered in an amount to be proved at trial, punitive damages, and for such other relief as the Court deems just and proper.

## COUNT II:
### Conversion

166. Plaintiffs re-allege paragraph 1-153 as if fully set forth herein.

167. The Honduras Development Project was conceived as a mixed-use development located in the city of San Pedro Sula, Honduras. The residential phase would consist of four hundred and twenty homes on eighty acres of land, while the commercial phase would include retail and office space as well as meeting spaces. The commercial phase also included the use of a license issued by the World Trade Centers Associations.

168. Beginning on or about March 11, 2012, thousands of squatters supported by Defendant Republic of Honduras and led by an organization known by the acronym CONAFEPH overran the private lands surrounding the Honduras Development Project.

169. CONAFEPH is the umbrella organization for various populist movements that advocate the taking of private lands and their transfer to low income individuals throughout Honduras. With the help of Defendants, CONAFEPH helped a group of squatters numbering in the thousands to build a veritable city consisting of individual homes and other structures on the private lands surrounding the Honduras Development Project. Defendants have also provided the squatters with electrical power and other services which upon information and belief include, but are not limited to, sanitation.

170. To legitimize their "claim" over the occupied lands, the squatters petitioned the Oficina Regional de Regularización Predial de la Cuidad de San Pedro Sula ("ORRP"), which

operates under the auspices of Defendant Instituto de Propiedad, to formally expropriate the land on the grounds of public need, including the site comprised the Honduras Development Project.

171. The government-backed ORRP accepted the squatters' petition without making any effort to verify the legitimacy of their "claim." The ORRP's decision conferred a special status on the squatters which allowed them to oppose the land owners' subsequent attempts to eject them from their lands. This action by the Honduras Government Defendants effectively blocked the Honduras Development Project from being able to assert its legal rights as an owner of private lands.

172. A Honduran court's denial of their petition did not stop the squatters. Instead, the squatters re-filed their petition which the ORRP once again accepted. And, once again, the squatters were able to occupy the privately-owned lands until their petition was resolved. During this period of time, the squatters were able to halt the construction and improvement of the site comprising the Honduras Development Project.

173. In or about September of 2013, a representative of the Honduras Development Project petitioned the ORRP's Director to intervene and prevent the filing of any further frivolous expropriation actions. The Director did not respond. Despite a subsequent court victory in Honduras, the squatters remain on the land.

174. Upon information and belief, Defendant Instituto de la Propiedad has stated that the government would give the squatters title to the lands they were occupying. Consistent with this "policy," in or about early 2015, the Municipalidad de San Pedro Sula (i.e., the local government) announced its intention to rezone the lands comprising the Honduras Development Project for low-income housing, a use which is inconsistent with the original site-development plan.

175.     Upon information and belief, the squatters, with the ongoing support of the Honduran Government Defendants, caused key documents regarding the ownership of the lands comprising the Honduras Development Project to be removed from official land records, or otherwise altered with the intent to confuse local authorities.   The Honduran Government Defendants have also accused the Honduras Development Project of failing to submit proper development plans all in an effort to deny Plaintiffs the full and fair use of their land.

176.     In addition, at various points in time, the government-backed squatters have blocked the free entry and exit into and out of the Honduras Development Project.   Their blockade has halted construction of new homes and has caused the value of existing homes to plummet.   The squatters have also blocked the development of the commercial phase of the Honduras Development Project beyond a limited number of preparatory improvements to the land.   And, upon further information and belief, the squatters are now physically encroaching onto the site of the Honduras Development Project.

177.     The government-backed squatters' actions are preventing Plaintiffs from fully using the lands comprising the Honduras Development Project and have caused those lands to lose their value.

WHEREFORE, Plaintiffs demand judgment against Defendants Republica de Honduras, Instituto de la Propiedad, and Empresa Nacional de Energía Eléctrica, for compensatory damages suffered in an amount to be proved at trial, punitive damages, and for such other relief as the Court deems just and proper.

## COUNT III:
## Civil Conspiracy

178.     Plaintiffs re-allege paragraphs 1-153 as if fully set forth herein.

179.    The Honduran Government Defendants entered into an agreement with one another for the purpose of expropriating the lands comprising the Honduras Development Project, blocking its development, and devaluing its assets thereby exercising dominion over the lands in a manner inconsistent with Plaintiffs' ownership rights.

180.    As part of the conspiracy, the Honduran Government Defendants:

a.  supported a group of illegal squatters who surrounded the Honduras Development Project with the effect of stopping all construction and development activities, devaluing the property, and driving potential residential home buyers, commercial tenants, and meeting organizers away;

b.  facilitated the repeated filing of legally frivolous petitions for expropriation on public grounds thereby allowing the squatters to continue blocking construction and development of the Honduras Development Project and evading all efforts to eject them from their illegal settlements;

c.  ignored requests by representatives of the Honduras Development Project to intercede and aid in the removal of the squatters and their illegal settlements;

d.  provided the squatters material support in the form of electricity necessary to maintain and operate their illegal settlements;

e.  falsified, hid, and altered documents regarding the ownership and title of the lands pertaining to the Honduras Development Project in an effort to bar or otherwise delay any efforts to eject the squatters from their illegal settlements;

f.  falsely accused representatives of the Honduras Development Project of failing to provide necessary plans and other related documents, again, in an effort to

bar or otherwise delay their ability to enforce any claims against the squatters; and

g. have supported efforts to block the Honduran Development Project and devalue its assets, causing an expropriation of the lands without prompt, adequate, and effective compensation.

181.    As a result of the Honduran Government Defendants' conspiracy, Plaintiffs have been injured.

WHEREFORE, Plaintiffs demand judgment against Defendants Republica de Honduras, Instituto de la Propiedad, and Empresa Nacional de Energía Eléctrica, for compensatory damages suffered in an amount to be proved at trial, punitive damages, and for such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury for all matters so triable.

Dated:  January 7, 2019

Respectfully submitted:

**ALVAREZ | GONZALEZ | MENEZES, LLP**
One Flagler Building
14 N.E. 1st Avenue
Suite 1105
Miami, Florida 33132
T. 305-723-1876
F. 786-475-7832

/s/ Carlos F. Gonzalez
Carlos F. Gonzalez
Florida Bar No. 494631
Email:  cfg@algofirm.com
Ignacio M. Alvarez
Florida Bar No. 40572
Email:  imalvarez@algofirm.com

*Atttorneys for the Plaintiffs*